COMMONWEALTH *vs.* GARY WESTERMAN.

Hampden. February 1, 1993. - April 5, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Electronic Surveillance. Search and Seizure,* Electronic surveillance, Probable cause, Warrant, Return. *Probable Cause. Evidence,* Wiretap, Certificate of drug analysis. *Controlled Substances. Practice, Criminal,* Disqualification of judge, Argument by prosecutor, Instructions to jury, Grand jury proceedings. *Grand Jury.*

An affidavit in support of an application for a wiretap established probable cause for the wiretap warrant to issue, and references in the affidavit to certain pen registers that were ruled unlawful did not taint the wiretap warrant, where the reliance on the pen registers was de minimis. [691-692]

An application for a wiretap warrant complied with the specificity and necessity requirements of G. L. c. 272, § 99 [692-694]; further, separate applications and warrants are not required for each intercept, where a single application meets the specificity and necessity requirement as to each intercept [694]. LIACOS, C.J., concurring.

There was no merit to the claim of a criminal defendant, seeking suppression of certain information collected under an authorized wiretap, that the judge who issued the wiretap warrant was not "neutral and detached." [694-695]

An application for the modification of or an amendment to a valid wiretap order that is still in effect must meet the same particularity and necessity requirements set forth in G. L. c. 272, § 99, applicable to applications for new wiretap warrants or for renewal of such a warrant. [695-696]

Applications for amendment to and for renewals of a wiretap warrant complied with the specificity and necessity requirements of G. L. c. 272, § 99. [696-697]

Renewal of a wiretap order was properly made to take effect at the expiration of the previous order. [697-698]

The return of service on a wiretap warrant was made in a timely manner in compliance with the provisions of G. L. c. 272, § 99 M. [698-699]

The record of a criminal proceeding supported the judge's determination that the prosecution had made a timely tender of delivery of wiretap

materials in compliance with the provisions of G. L. c. 272, § 99 O 1. [699]

A defendant convicted of trafficking in cocaine demonstrated no prejudice from the admission in evidence of a certificate of analysis by a chemist of the Department of Public Safety that was in technical noncompliance with a since-repealed provision of G. L. c. 147, § 4D, that required the results of the analysis to be sent to the Department of Public Health before a complaint is brought. [699-700]

At a criminal trial, no substantial risk of a miscarriage of justice resulted from the prosecutor's remarks in closing argument. [700-701]

The judge at a criminal trial correctly refused to give a requested instruction on the "cocaine isomer defense" where that defense theory was not supported by any evidence. [701-702]

The record of two simultaneous grand jury proceedings, resulting in two indictments against one individual for two separate offenses, demonstrated no violation of G. L. c. 277, § 1A. [702-703]

INDICTMENT found and returned in the Superior Court Department on December 5, 1986.

A pretrial motion to suppress evidence was heard by *William W. Simons*, J., and the case was tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Vincent A. Bongiorni* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On September 30, 1988, a jury convicted the defendant, Gary Westerman, of trafficking in cocaine. The defendant filed a timely appeal, and we transferred the case to this court on our own motion. In his appeal, the defendant alleges numerous errors. The crux of the appeal, however, turns on the appropriate use by police of electronic surveillance techniques authorized under G. L. c. 272, § 99 (1990 ed.). After reviewing the record, we conclude that there were no errors that require reversal of the conviction.

Beginning in 1985, the office of the district attorney for the Hampden district conducted an investigation into the suspected loansharking activities of Frank Pugliano, Francesco Campiti, and some of their associates. Between Febru-

ary and April of 1986, a Superior Court judge authorized the installation of pen registers to monitor telephone calls made between some of the suspects.[1] On September 18, 1986, another judge issued a warrant for a wiretap of several telephone lines associated with Pugliano and Campiti, including a "cross frame unit trap"[2] used to monitor the telephones of Travel Majic, a travel agency whose telephone lines had been allegedly connected to the suspected loansharking activities. The warrant also authorized a pen register on the home telephone of Campiti.

Based on information gathered from the electronic surveillance and further police investigations, the judge, on October 10, 1986, granted a request by the district attorney to amend the wiretap warrant. The amendment authorized a wiretap of Campiti's home telephone in addition to the pen register already in place. It also expanded the scope of the warrant beyond loansharking to include conversations about drug trafficking among new suspects. Westerman was one of these new suspects.

Renewals of the amended warrant were issued on October 17, October 30, and finally on November 15, 1986. On October 21, 1986, at the request of the investigators, the judge also ordered an electronic surveillance of Campiti's automobile which was extended on November 12, 1986.

The defendant was indicted by two separate Hampden County grand juries. The first grand jury were called in July, 1986, to hear evidence of loansharking activities by the so-called "Pugliano-Campiti" organization. This grand jury were extended until January 30, 1987, during which time they heard new evidence acquired by the on-going police in-

---

[1] The applications for these warrants were eventually ruled invalid by the judge who heard the defendant's motion to suppress. See part 1, *infra.* A pen register is a mechanical device that records only the numbers dialed on a telephone. It does not record conversations.

[2] A cross frame unit trap records the telephone numbers of incoming calls to a telephone line under surveillance. We have held that cross frame unit traps, like pen registers, are expressly authorized by G. L. c. 272, § 99. *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 587, 591-592 (1980).

vestigation. On January 30, this grand jury indicted Wester-
man for trafficking in a class B substance (cocaine), G. L. c.
94C, § 32E (*b*) (3), on or about November 16, 1986, in
Agawam. A second· grand jury indicted Westerman for traf-
ficking in cocaine on or about November 17, 1986, in
Westfield.

The police executed a warrant to search Westerman's
home for cocaine on November 17, 1986. The search uncov-
ered assorted drug paraphernalia as well as a number of
plastic bags containing lumps of what the police believed to
be cocaine. He was convicted on one charge of trafficking in
cocaine in Westfield.

1. *The wiretap.* At trial, Westerman filed a motion to sup-
press any evidence derived from the electronic surveillance of
Campiti's business and home telephones, and automobiles.
After hearing, the judge denied the motion. Westerman now
claims that the judge's denial of that motion constitutes re-
versible error. We disagree.

We note at the outset that the defendant shoulders the
burden of establishing that evidence has been illegally ob-
tained in cases where a search is conducted pursuant to a
warrant. *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 56
(1974), and cases cited. The defendant argues that the initial
September warrant was invalid because of references to pre-
vious pen registers which were ruled illegally obtained by the
motion judge. Standing on a novel expansion of the "fruit of
the poisonous tree" doctrine, *Wong Sun* v. *United States*,
371 U.S. 471, 488 (1963), the defendant asserts that the ille-
gally obtained information "taints" the wiretap so that any
evidence produced by the wiretap is inadmissible as fruit
from the poisonous tree. Assuming the previous pen registers
were in fact illegally obtained and the fruit of the poisonous
tree doctrine applies to warrants for wiretaps, we neverthe-
less affirm the judge's ruling that the wiretap order was not
"tainted" because any reliance on the pen registers was de
minimis.

The affidavit submitted by Trooper Peter J. Higgins of the
State police in support of the wiretap order is thirty-eight

pages long. The only direct reference to the previous pen registers occurs in one paragraph on one page. We recognize that some of the information obtained from the pen registers was incorporated into other parts of the affidavit. We also acknowledge that the affidavits supporting those pen registers were attached to the wiretap application.[3] However, even if all these materials were excised from the application, there still exists ample evidence to establish the requisite probable cause for a warrant to issue. See G. L. c. 272, § 99 E. The bulk of the thirty-eight pages concerns meetings with confidential informants who provided the police with new information regarding the loansharking activities of the Pugliano-Campiti ring. There is no evidence that this information was in any way dependent on the earlier pen registers. See *Commonwealth* v. *Jarabek*, 384 Mass. 293, 300 n.7 (1981) (whether witness's testimony was independent and not derived from unlawful interception is proper issue for motion to suppress). Therefore, because the warrant was supported by sufficient probable cause independent of the objectionable material, the defendant fails to carry his burden. See *Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978) (false statement in application for search warrant); *Commonwealth* v. *Assad*, 393 Mass. 418, 422 (1984) (misstatement in application for wiretaps).

The defendant also attacks the specificity and necessity of the wiretap application under G. L. c. 272, § 99. Massachusetts law requires that the application describe with particularity the persons, places, offenses, and communications involved. § 99 F. The law further requires the applicant to show that normal investigative procedures are or would be

---

[3]The defendant argues correctly that applicants for a wiretap must expressly disclose previous applications and warrants. G. L. c. 272, § 99 F 2 h. We hold that the references to the earlier pen registers in the application for the September warrant along with the attached affidavits supporting those earlier intercepts constitute sufficient disclosure under the statute.

inadequate. § 99 E 3.[4] The defendant opines that the application recites only "boilerplate generalities" which many Federal courts have held to be insufficient grounds for granting a wiretap order under the Federal statute. See, e.g., *United States* v. *McCoy*, 539 F.2d 1050, 1055 (5th Cir. 1976), cert. denied, 431 U.S. 919 (1977). The detailed facts alleged in the supporting affidavits, however, belie the defendant's claim. Trooper Higgins's affidavit identifies and describes in depth the specific targets of the surveillance, with whom they communicate, how and where they communicate, as well as the illegal actions committed. The information is based not on mere speculation but on first-hand police investigations and the reports of reliable informants. The application, therefore, establishes probable cause with sufficient particularity. See *Commonwealth* v. *Wilson*, 405 Mass. 248, 250-251 (1989). With regard to necessity, the affidavit points out several specific reasons for the failure of alternative methods of collection: "counter-surveillance," identification of undercover operatives, the failure of witnesses to testify, the number of individuals and locations involved, and the inability of informants to reach the leaders of the conspiracy. We hold that these circumstances more than adequately satisfy the statutory requirement of necessity. See, e.g., *United States* v. *Turner*, 528 F.2d 143, 152 (9th Cir.), cert. denied sub nom. *Grimes* v. *United States*, 423 U.S. 996 (1975), and sub nom. *Hackett* v. *United States*, 429 U.S. 837 (1976); *United States* v. *Kerrigan*, 514 F.2d 35, 38 (9th Cir.), cert. denied, 423 U.S. 924 (1975).

In regard to the sufficiency of the warrant itself, the defendant claims that the coverage of unknown parties involved in the criminal organization violates the particularity requirements of § 99 F 2 b and § 99 I 3. We hold that, because the intercepted communications of unidentified parties were sufficiently limited to (1) subject matter which concerned the

---

[4]Section 99 E 3 states that a warrant may issue only "[u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried."

crimes being investigated, and (2) conversations with named conspirators, there was no violation of the statute or privacy rights.

The defendant also claims that separate applications were necessary to authorize the pen register on Campiti's home telephone and a cross frame unit trap on the telephone lines of Travel Majic. We have held that "a separate order under § 99 authorizing the use of a pen register ... is not required where a valid order authorizing a simultaneous wiretap interception has been issued." *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 591 (1980), citing *Commonwealth* v. *Vitello*, 367 Mass. 224, 279 (1975). We have applied this rule to cross frame unit traps as well. *District Attorney for the Plymouth Dist.*, *supra.* The justification for these decisions is that, where a judge has already determined from a wiretap application that § 99 E's requirements of probable cause and necessity have been met, a separate order for a less intrusive interception over the same telephone line provides no further protection to private citizens. See *id.* at 591-593. Today, we extend this reasoning. We hold that separate orders are not required to authorize simultaneous intercepts over different lines of communication if the requirements of § 99 E and § 99 I are fully satisfied as to each intercept. In this case, the application expressly requests the pen register and the cross frame unit trap for different telephone lines and, when examined as a whole, sets out with particularity the necessity for both. See *Commonwealth* v. *Saleh*, 396 Mass. 406, 411-412 (1985). Consequently, the order having incorporated the information presented in the application, we conclude that it complies with the particularity requirements of § 99 I. Therefore, because the strict requirements of § 99 are satisfied as to each intercept, we hold that the September warrant authorizing multiple wiretaps was valid.

Training his sights next on the judge who issued the September warrant, the defendant charges that the judge was not "neutral and detached" as required by the Fourth Amendment to the United States Constitution because in an

immediately preceding trial the judge heard evidence relating to the defendant's case. This claim, however, misconceives the nature of the "neutral and detached" requirement. There is no rule of law requiring that a judge be ignorant of the facts surrounding a case over which he presides, especially facts which he learned in his own court. See *Fogarty* v. *Commonwealth*, 406 Mass. 103, 111 (1989). A judge need not recuse himself from a trial or a warrant application simply because certain background information was disclosed in prior cases. A warrant cannot be issued by a biased judge or one who may have a stake in the outcome. Westerman, however, offers no evidence that the judge was biased in any way. Had the judge been a former prosecutor or had he investigated this case on behalf of the police, then the defendant would have a valid claim. See *Coolidge* v. *New Hampshire*, 403 U.S. 443, 449-453 (1971) (no "neutral and detached magistrate" when warrant issued by Attorney General who investigated and prosecuted case).

For these reasons, we hold that the September wiretap order was valid and therefore there was no error in denying the defendant's motion to suppress evidence derived therefrom on the ground that the order was invalid.[5]

2. *Amended wiretap and renewals.* On October 10, 1986, the warrant authorizing electronic surveillance of Travel Majic and Campiti's home for evidence of loansharking activities was amended to permit wiretapping of several new suspects for evidence of drug trafficking and illegal gaming. This amended warrant was thereafter extended on October 17, October 30, and finally on November 15, 1986. The defendant claims that these changes do not constitute "minor alterations" of an existing warrant; rather, he claims they amount to a petition for a new warrant to pursue a new investigation. An application for a new warrant must satisfy

---

[5]The defendant also claims that the September warrant for loansharking was a subterfuge designed intentionally to divert the judge's attention from the true target of the investigation: drug trafficking. Because the defendant can offer no proof beyond coincidence and speculation, this claim is without merit.

the provisions of § 99 F. The defendant asserts that the affidavits supporting the amendments fail to meet those requirements.

We note first that the statute is silent with regard to amending or modifying a wiretap warrant, and no cases squarely address the issue. See *United States* v. *DeJesus*, 752 F.2d 640, 643 (1st Cir. 1985). The statute does, however, provide for renewing wiretap warrants under § 99 J. The concern of that provision is that the renewal application fully satisfy the same requirements that applications for warrants must satisfy under § 99 F. Hence, a renewal, like an application for a new warrant, must contain reliable information that describes with particularity probable cause and necessity for the proposed wiretap. Compare § 99 J with § 99 F. We hold, therefore, that a modification of or an amendment to a valid wiretap order that is still in effect is valid under § 99 if the request fully satisfies the provisions of § 99 F.

After reviewing the October 10 application for amendment to the September warrant, we conclude that it complies with § 99 F, and therefore is a valid warrant. Probable cause to investigate the drug trafficking and illegal gaming activities of certain individuals was well documented in the supporting affidavit. The information was gathered from incidental interception of collateral matters made in good faith under the previous warrant and from confidential informants who witnessed the drug deals. The affidavit also details how the new targets of the amended warrant were linked to the illegal activities of the Pugliano-Campiti organization. With respect to a conspiracy to traffic in drugs, probable cause was sufficiently established by the pen register information and the reports of eyewitnesses. The information reveals that the targeted individuals were involved in illegal activities and were seen repeatedly with known members of organized crime in the context of these illegal activities; that these same individuals were in frequent telephone contact with each other; and that they often rode in the same automobiles and utilized establishments owned or operated by known members of the crime ring. See G. L. c. 272, § 99 A

("[o]rganized crime . . . consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services"); *Commonwealth* v. *Thorpe*, 384 Mass. 271, 275-277 (1981), cert. denied, 454 U.S. 1147 (1982).

With regard to necessity, the crucial fact is that the amended warrant and subsequent renewals covered the same organized crime group previously identified; only the number of individuals involved had expanded and the scope of its illegal activities had been clarified. Thus, absent a change of circumstances, alternative methods of surveillance remained unlikely to succeed. We conclude that the affidavits describe the operation of the criminal organization in enough detail to allow a judge to determine whether the circumstances still justified electronic surveillance measures.

After reviewing the renewal orders, we conclude for the same reasons that the provisions of § 99 J were adequately met.[6] The defendant, however, attacks the order to renew surveillance on October 30, 1986, on the ground that, because the order was effective immediately, the allowable days of interception should be counted from October 30, rather than November 2. We hold that there was no error in delaying the effective date of the renewal order. The judge issued the order on October 30 but delayed effectiveness until November 2. An application for renewal under § 99 J 1 must be made before the previous order has terminated. Here, the previous order did not terminate until November 1.[7] Thus,

---

[6]The defendant also objects to the order for electronic surveillance of Campiti's automobile on October 21, and the extensions of that order on November 12, 1986. We discern no basis for this objection. The applications state that the suspects had been avoiding police surveillance by transacting business in certain rented or personally-owned automobiles rather than over phones or at Travel Majic. Thus, probable cause and necessity were shown with sufficient particularity.

[7]We note that § 99 J 2 states that "the judge may issue an order renewing the warrant and extending the authorization for a period not exceeding fifteen (15) days from the entry thereof." A renewal order is issued based on present circumstances which establish probable cause and necessity. § 99 J 1. Thus, any unreasonable delay between the entry of the renewal order and the effective date of the warrant casts doubt on the

the renewal could not have been effective until November 2. Moreover, there was no showing either that the two-day delay dissipated the probable cause supporting the order or that the defendant suffered unfairly because of it. On the contrary, the evidence collected during the two disputed days was cumulative of additional evidence. Hence, any error was harmless. *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990), quoting *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987).

3. *Surveillance tapes.* The police made a return of service for the September warrant on December 2, 1986, the same day the November 15 renewal expired. The defendant objects to this return. He argues that, because interceptions over the Campiti telephone ceased on November 20, 1986, and within the automobile by at least October 27, 1986, when it was returned to the rental agency, the return was not made within seven days as required by § 99 M. He alleges that all surveillance tapes must be returned and sealed within seven days *after the surveillance has terminated.* We disagree.

The defendant's argument contradicts the plain meaning of the statute. Section 99 M of the wiretap statute states that "[w]ithin seven days *after termination of the warrant or the last renewal* thereof, a return must be made thereon to the judge issuing the warrant . . . " (emphasis added). This language tracks the provision in the Federal wiretap statute: "[i]mmediately upon the *expiration of the period of the order, or extensions* thereof, such recordings shall be made available to the judge issuing such order . . ." (emphasis added). 18 U.S.C. § 2518 (8) (a) (1988). Under both statutes return is not required until the expiration of the last renewal or extension of the warrant order. Once the order terminates, however, return must be made as soon as practicable, and in no case may delay extend beyond the

validity of the renewal. *Commonwealth* v. *Vitello*, 367 Mass. 224, 232 (1975) ("In all cases execution of a warrant shall be forthwith . . .").

statutory seven-day window. *Commonwealth* v. *Vitello*, *supra* at 267.

The defendant also charges that the prosecution violated § 99 O 1 by failing to provide him with copies of the intercepted materials thirty days before trial. Section 99 O 1 states that "in any criminal trial where the commonwealth intends to offer in evidence any portions of the contents of any interception or any evidence derived therefrom the defendant shall be served with a complete copy of each document and item which make up each application, renewal application, warrant, renewal order, and return pursuant to which the information was obtained." Failure to make such service within the requisite thirty days renders the evidence inadmissible at trial. *Id. Commonwealth* v. *Picardi*, 401 Mass. 1008 (1988).

The original trial date was set for August 16, 1988. From the record, it is unclear whether the defendant received *all* the materials to which he was entitled under § 99 O. In any event, the judge granted the defendant's motion for a continuance and set September 22, 1988, as the new trial date, thirty-five days later. The Commonwealth claims that it tendered "redelivery" to defense counsel of all the intercepted materials on August 19 and again on August 21. His office staff reported that defense counsel was on vacation. The Commonwealth further claims that defense counsel agreed to delivery on August 25, 1988. The defendant's brief does not address these allegations. Delivery or redelivery was, in fact, made on August 25, 1988, or twenty-nine days before trial commenced on September 22. What is clear, however, is that the judge determined that service to the defendant had been made "well in advance of the thirty days" before trial by tender of delivery. Based on the evidence in the record as it stands, we affirm that decision. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990) (motion judge's findings of fact are accepted during review of denial of motion to suppress).

4. *Chemist's certificate.* The defendant asserts that the judge improperly admitted in evidence a certificate by a

chemist of the Department of Public Safety in violation of G. L. c. 147, § 4D, repealed by St. 1991, c. 412, § 39. Section 4D, second par., stated that the results of the chemist's analysis must be sent to the Department of Public Health before a complaint is brought. The Commonwealth concedes that this provision was not met, but argues that the violation does not require exclusion of the certificate. We agree.

The language of § 4D is a species in a family of statutory provisions that establish certificates of analysis as prima facie evidence of the composition and quantity of the substance analyzed. See, e.g., G. L. c. 111, § 13 (1990 ed.) (narcotic or other drug, poison, medicine, or chemical); G. L. c. 111, § 10 (paint, turpentine, linseed oil, or synthetic substitute); G. L. c. 138, § 36 (alcoholic beverages); G. L. c. 147, § 4F (sperm cells or seminal fluid). As such, the chemist's certificate is rebuttable evidence and not conclusive proof. See *Commonwealth* v. *Harvard*, 356 Mass. 452, 462 (1969). Exclusion in this case would neither safeguard any constitutional protections nor advance any public policy goals. See *Commonwealth* v. *Lett*, 393 Mass. 141, 145 (1984). Thus, any procedural or administrative errors affect only the weight of the evidence. In this case, moreover, there was no risk of prejudice to the defendant because the chemist testified and was subject to cross-examination. The defense also called rebuttal witnesses to dispute that validity of the analysis. The judge even instructed that the certificates "may be accepted" by the jury to be adequate proof of composition and quantity "unless you find some other evidence in the case." In these circumstances, we conclude that the judge did not commit prejudicial error by admitting the chemist's certificate.

5. *Prosecutorial misconduct.* The defendant claims that the prosecutor's remarks in closing argument constituted prosecutorial misconduct and that the judge's failure to give immediate curative instructions is reversible error. We disagree.

The prosecutor referred to the distribution of drugs to children and asked the jury to hold the defendant accountable for his life-style and the effect of his actions on the commu-

nity. We note, first of all, that defense counsel failed to object to the latter statements and hence we review those remarks only for a substantial risk of a miscarriage of justice. *Commonwealth* v. *Haskins*, 411 Mass. 120, 121 (1991). We review the entire record as well as the effect of curative instructions in determining whether any misconduct requires reversal of a conviction. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987). In this case, statements regarding the effect of the defendant's actions on his community were not unfairly prejudicial in light of the evidence illuminating the defendant's involvement with organized crime. Additionally, the judge properly instructed the jury not to be influenced either by the "unpopularity" of the crimes charged or the arguments of counsel, but rather to confine their deliberations to the evidence presented. The judge specifically addressed the remark relating to distribution to children by stating that no evidence was introduced regarding that assertion, ordering the jury not to consider the remark, and ordering the remark struck. Given these curative instructions, there was no prejudicial error. Cf. *Commonwealth* v. *Clary*, 388 Mass. 583, 592 (1983) (extended characterization of defendant as lesbian constituted misconduct). In holding that there was no reversible error, we note that it is well within the judge's discretion to deny a mistrial on the ground of prosecutorial misconduct and rely instead on curative instructions, even in the case of intentional misstatements by the prosecution. *Commonwealth* v. *Charles*, 397 Mass. 1, 12 (1986).

6. *Jury instructions.* The defendant objects to the judge's refusal to give an instruction on the "cocaine isomer defense" and on the amount of cocaine actually involved. See generally *United States* v. *Ross*, 719 F.2d 615 (2d Cir. 1983). See also *Chappee* v. *Vose*, 843 F.2d 25, 33 n.6 (1st Cir. 1988) (cocaine isomer defense to Federal charge vitiated by amendments to Federal statute). General Laws c. 94C, § 31 (*a*) (4) (1990 ed.), defines a class B substance as "[c]oca leaves and any . . . derivative . . . which is chemically equivalent." The cocaine isomer defense asserts that only the so-called "L-co-

caine" isomer of the cocaine molecule is a derivative of the coca leaf and therefore is the only isomer prohibited by law. *Ross, supra* at 617, 618. See *Commonwealth* v. *Chappee,* 397 Mass. 508, 519 & n.4 (1986). After reviewing the record, we hold that there was no error in the instructions read to the jury.

The trial transcript reveals that the defense never proffered any evidence that a cocaine isomer was involved, but argued merely that the Commonwealth had failed to show that the cocaine involved was L-cocaine and not a synthetic isomer. The defense has a right to present this argument but cannot claim now, however, that a failure to instruct a jury on such a defense unsupported by any offer of proof entitles the defendant to reversal of his conviction. Moreover, the defendant's proposed instruction is confusing, legally inaccurate in part, and cites no authority. In contrast, the judge properly instructed the jury that they had to find beyond a reasonable doubt that the substance involved was "cocaine, a derivative of the coca leaf" thus excluding artificial substitutes.

The jury heard instructions relating the crimes charged to the amount of cocaine in the mixtures obtained by the police. The jury did not have to find that the defendant intentionally commingled cocaine with other substances as proposed in the defendant's requested instruction. *Commonwealth* v. *Beverly,* 389 Mass. 866, 868-869 (1983). The jury were offered several lesser included offenses based on the amount of cocaine actually possessed by the defendant. Therefore, had the jury believed that the defendant possessed less than 200 grams of cocaine, they could have convicted him of a lesser charge. They did not. We hold that the instructions as a whole accurately defined the elements of the offenses involved and, therefore, adequately protected the defendant's rights. See *Commonwealth* v. *Daye,* 411 Mass. 719, 739 (1992).

7. *Grand juries.* Finally, Westerman claims that his indictment by a second grand jury violated G. L. c. 277, § 1A (1990 ed.), because the second grand jury considered matters that were still pending before a prior, extended grand jury.

Section 1A states that "[t]his section shall not be construed to prevent the issuance of writs of venire facias authorized by section one for impanelling a grand jury whose duty shall include all business not then before the grand jury continued under authorization of this section." We read this statute as precluding a second grand jury from examining only those subjects "leading to a particular presentment before the prior grand jury." *Commonwealth* v. *Leavitt*, 17 Mass. App. Ct. 585, 590, cert. denied, 469 U.S. 835 (1984). All other areas are open to investigation. *Id.*

In this instance, the first grand jury indicted the defendant on charges of drug trafficking in Agawam; the second indicted him on separate charges of drug trafficking and conspiracy in Westfield. The only overlap in the evidence presented to both grand juries concerned the operations of the Pugliano-Campiti crime syndicate. This evidence was necessary as background to the crimes charged in an ongoing investigation. Given the scale and complexity of organized crime, it is unreasonable to assume one grand jury must sit for the length of the investigation and address every concern. *Id.* at 589-590. We hold, therefore, that the defendant's indictment by a second grand jury did not violate G. L. c. 277, § 1A.

With regard to "new" business presented to the extended grand jury, we note that the purpose of c. 277, § 1A, is to prevent a grand jury from sitting indefinitely, but not to prohibit them from hearing new evidence within the general scope of their inquiry. See *United States* v. *Johnson*, 319 U.S. 503, 511 (1943) (extended grand jury only forbidden from inquiry into dissociated subject matter). Here, although the subject matter presented to the first grand jury switched from loansharking to drug trafficking, the information resulted from investigations in progress before the extension and before the true scope of illegal activities of the Pugliano-Campiti organization had been determined. The evidence of

drug trafficking, therefore, was not a "new" business outside the scope of the first grand jury. G. L. c. 277, § 1A.

*Judgment affirmed.*

LIACOS, C.J. (concurring). The court today reaffirms its prior decision that a valid warrant authorizing the wiretap of a telephone line permits the installation of a cross frame unit trap to monitor that line. *Ante* at 694. See *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 591 (1980). Extending this rule, the court also holds that cross frame unit traps may be installed on separate telephone lines pursuant to a valid warrant authorizing multiple wiretaps. *Ante* at 694. This result is consistent with the court's holding in *District Attorney for the Plymouth Dist., supra.* I concur, because I am bound by that decision.

I write separately to reiterate my concern for the privacy rights of callers whose telephone numbers might be caught up in the cross frame unit trap, where a wiretap alone may not have disclosed the identity of these callers. I adhere to my view that a finding of probable cause that telephone A is being used for criminal purposes does not necessarily support a finding of probable cause as to telephone B (and C, D, E, etc.). See *id.* at 598 (Liacos, J., dissenting). In my view, the court's decision in *District Attorney for the Plymouth Dist.* did not address this issue adequately. While the record before us today does not present such a problem, there may arise a case where a cross frame unit trap yields evidence against a caller as to whose telephone there existed no probable cause to suspect criminal use. Should the government seek to prosecute such a caller, I believe that he or she would have standing to move for suppression of all evidence obtained pursuant to the unlawful surveillance.