## Commonwealth *vs.* Joel Rodriguez.[1]

No. 05-P-680.

Hampden. May 4, 2006. - October 30, 2006.

Present: Armstrong, Green, & Katzmann, JJ.

Further appellate review granted, 448 Mass. 1101 (2006).

*Controlled Substances. Electronic Surveillance. Search and Seizure,* Electronic surveillance, Expectation of privacy. *Constitutional Law,* Search and seizure, Privacy. *Privacy. Practice, Criminal,* Argument by prosecutor, Appeal, Admissions and confessions, Instructions to jury. *Evidence,* Admissions and confessions.

At a criminal trial, the admission of evidence of a conversation gathered by police through warrantless electronic surveillance did not create a substantial risk of a miscarriage of justice, where the defendant lacked a reasonable expectation of privacy in the conversation, which exclusively concerned a business transaction, was engaged in by two individuals (the defendant and another) who were not close friends, and took place in a private residence over which the defendant did not have control. [639-644]

A criminal defendant failed to demonstrate that the prosecutor improperly used rebuttal evidence for a substantive purpose in his closing argument at trial. [645]

A criminal defendant could not raise, for the first time on appeal, an argument that the Commonwealth had violated the provisions of G. L. c. 272, § 99 O 2, which outlines service procedures for certain wiretap evidence. [645-646]

A Superior Court judge did not err in denying a criminal defendant's motion to suppress a statement that he made while refusing to cooperate with the police, where the statement was not sufficient to qualify as an invocation of a right to cut off questioning, and where, even if the initial statement was a sufficient invocation of the defendant's right to remain silent, his subsequent inculpatory remarks were spontaneous and without provocation, and any error in their admission was cured by the judge's limiting instruction. [646-648]

At a criminal trial, the judge's instructions to the jury regarding the "bringing into" theory of cocaine trafficking, which deviated from the statutory language, were advantageous to the defendant and did not create error [648-649]; further, the evidence presented at trial was sufficient to warrant the defendant's conviction on both this theory (even under the higher standard imposed by the jury instructions) [649-650] and the theory of possession with intent to distribute, and there was therefore no merit to the

[1]Also known as Joel Rodriguez Colon.

defendant's contention that it was error to submit a general verdict form to the jury [650].

INDICTMENT found and returned in the Superior Court Department on February 25, 2003.

The case was tried before *Bertha D. Josephson*, J.

*Beth L. Eisenberg*, Committee for Public Counsel Services, for the defendant.

*Thomas H. Townsend*, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. A jury convicted the defendant of trafficking in cocaine in excess of 200 grams. G. L. c. 94C, § 32E(*b*)(4). The case involved the delivery of a package from Barranquilla, Colombia, that contained cocaine carefully concealed inside a bicycle frame. On appeal the defendant argues that (1) it was error to admit in evidence a conversation gathered through warrantless electronic surveillance; (2) the judge improperly denied his motion to suppress a statement that he made to the police after his arrest; and (3) his motion for a required finding of not guilty should have been granted as to the second theory of trafficking submitted to the jury, and because it was impossible to determine on which theory the jury's verdict was based, his conviction must be reversed.

On January 28, 2003, an official from the United States Customs Service notified Massachusetts State police Sergeant John Michel, a member of the Hampden County narcotics task force, that they had intercepted a package containing illegal narcotics. The way-bill indicated that it was sent from Barranquilla, Colombia. The box contained a bicycle frame within which cocaine was secreted and was addressed to Pedro Tirado, 5 Ardmore Street, Springfield. Sergeant Michel obtained an anticipatory search warrant for 5 Ardmore Street, and the task force executed a plan to tender delivery of the package to Tirado on January 29.

On that date, Trooper Michael Joselyn posed as a delivery person from DHL delivery service and arrived at 5 Ardmore Street at about 11:30 A.M. He knocked on the front door with the package in hand and was greeted by a woman who called to

Tirado. Trooper Joselyn informed Tirado that he had a package for him. Tirado signed for the package after confirming that it was addressed to him. About fifteen minutes later the police executed the search warrant. Officers used a battering ram to enter the apartment after receiving no response at the front door and found Tirado sleeping in a bedroom with his wife. Tirado was handcuffed, was given Miranda warnings, and was told that he was in trouble. He volunteered to cooperate.

Tirado denied that the package belonged to him and gave police the following account of how he had come to possess it. About a week to a week and one-half earlier, Tirado explained, the defendant offered to pay him $400 if he would accept delivery of a package. Tirado said the defendant was an acquaintance he had met through a mutual friend only a couple of months earlier. Tirado was unemployed, drug-addicted, and dependent upon Social Security benefits. He accepted the defendant's proposal because it included an offer of cash. The defendant explained how and when the package would arrive, but did not disclose the nature of its contents. The defendant instructed Tirado to dial his cellular telephone number after he received it and told him he would be paid when "everything was all right."

When Tirado concluded his story, the police had him place a telephone call to the defendant. Officer Aurelio Garcia stood nearby and could hear the defendant talking to Tirado.[2] The defendant told Tirado that he would pick up the package. Tirado gave the defendant directions to 5 Ardmore Street because the defendant had never previously visited the address.

While awaiting the defendant's arrival, Officer Garcia placed an electronic monitoring device inside Tirado's shirt pocket. An accompanying device was put inside Trooper Juan Colon's vehicle, parked outside the apartment, to enable the monitoring and recording of Tirado's communications. Trooper Colon later discovered that the volume control on the recording device had

---

[2]Officer Garcia was assigned to listen in on the conversation because he spoke Spanish. No listening device was used to monitor the initial communications between Tirado and the defendant, but Officer Garcia testified that he was standing close enough to Tirado to hear both ends of the conversation.

been set too low to produce an audible recording, but he was able to hear the defendant's conversation with Tirado as it unfolded through the speaker.

The defendant took a taxicab to 5 Ardmore Street. The taxicab parked in front of the address, and the taxicab's trunk popped open. The defendant got out of the vehicle and met Tirado at the front door. The two men entered the apartment and walked to where the package was located. The defendant "grabbed" the package and paid Tirado $200, telling him that he would pay the remaining $200 balance later. Tirado testified that he asked the defendant to open the package, but the defendant said that he did not have enough time. As the defendant started to leave the apartment with the package, he got a telephone call and asked Tirado to carry the package outside. Tirado declined, telling the defendant, "[I]t's your package." The defendant ended the telephone call and continued out the door. He had spent no more than ten minutes in the apartment.

The defendant reached the trunk of the taxicab and was placing the package inside when four officers appeared, yelling "police" in both English and Spanish. The defendant looked at the officers before fleeing on foot, but he was quickly brought to the ground and, after a brief struggle, handcuffed. A search of the defendant revealed three small bags of marijuana, a cellular telephone, and just over $1,000 in cash. Officer Garcia then read the defendant Miranda warnings before transferring him to the Springfield police station.

Inspection of the package revealed a bicycle frame, which when pried open was found to contain almost 900 grams of seventy-one percent pure cocaine.

1. *Admission of evidence gathered through warrantless electronic surveillance.* At trial, the defendant testified and denied any prior arrangement with Tirado involving the delivery of the package. The defendant claimed that he first learned of the package on the morning of his arrest, when Tirado called to ask for a favor. According to the defendant, Tirado asked him to pick up the package because he could not keep it at his home due to a problem with his wife. As for the $200 that was exchanged, the defendant testified that Tirado asked to borrow

the money and that he reluctantly agreed only when Tirado promised to pay him back.

In rebuttal, the Commonwealth called Trooper Colon, who had used the electronic device to monitor the conversation inside 5 Ardmore Street. Trooper Colon, working from memory, testified that he heard Tirado ask the defendant, "How much are you going to pay me?," and the defendant responded, "Four hundred." Next, Colon heard "money being counted out." Colon testified that he did not hear Tirado ask for a loan, nor did he hear Tirado promise to repay the defendant.

a. *Article 14 claim.* The defendant argues on appeal that admission in evidence of Colon's recollection of the electronically intercepted conversation violated the defendant's rights under art. 14 of the Massachusetts Declaration of Rights.[3] According to the defendant, the police should have obtained a warrant before intercepting the conversation that took place in the apartment in which Tirado was staying.

Contrary to the defendant's contention on appeal, this issue was not preserved below. As the Commonwealth correctly points out, the defendant only posited a general objection to such testimony during a bench conference that focused on scheduling concerns rather than resolution of any substantive issue. Immediately after the Commonwealth rested, the judge asked defense counsel whether he had any additional evidence and how much time he would need. When counsel told the judge that he intended to call the defendant, the prosecutor alerted the judge to the possibility that he would call three rebuttal witnesses. The witnesses would testify to three conversations, respectively, including a conversation the defendant had in jail, a conversation the defendant had on the telephone with Tirado, and the conversation in Tirado's apartment that Colon monitored

---

[3]The defendant properly does not mount a challenge to the admission of the intercepted conversation under G. L. c. 272, § 99, the Massachusetts wiretap statute. The express provisions of the wiretap statute make clear that where, as here, the police obtained the consent of at least one of the parties to the conversation in a case involving a "designated offense," a warrant need not be obtained. See generally *Commonwealth* v. *Blood*, 400 Mass. 61, 66-67 (1987). Similarly, "warrantless surveillance with 'one party consent' has been held to lie beyond the protective reach of the Fourth Amendment to the United States Constitution." *Id.* at 67.

with electronic surveillance equipment. The judge explicitly stated that she was not prepared to rule on the admissibility of such conversations during the bench conference, and defense counsel responded that he would raise his objections "with the court later."

When the testimony was presented at trial, the defendant objected once, when the prosecutor posed a question that purportedly asked the witness to speculate. No other objection was forthcoming, nor did the defendant present his claim in a motion to suppress.[4] Therefore, error, if any, in the admission of the evidence may only be reviewed to determine if it created a substantial risk of a miscarriage of justice. See *Commonwealth v. Zinser,* 446 Mass. 807, 808 (2006) ("All claims, waived or not, must be considered"); *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10, 18-19 & n.20 (1986) (unobjected-to constitutional error subject to substantial risk standard of review).

To challenge the propriety of the warrantless seizure of evidence under art. 14, the defendant bears the burden of showing that he "had a subjective expectation of privacy in the object of the challenged search that society is willing to recognize as reasonable." *Commonwealth* v. *Eason,* 427 Mass. 595, 599 (1998). See *Commonwealth* v. *Pina,* 406 Mass. 540, 544-545 (1990); *Commonwealth* v. *Montanez,* 410 Mass. 290, 301 (1991). If we concede for present purposes that the defendant may have had a subjective expectation of privacy in his conversation with Tirado while he was in the apartment, the remaining question is whether society is prepared to accept that expectation as reasonable.

The defendant argues that because the conversation at issue took place in a private home, the expectation of privacy was a reasonable one, and therefore a warrant was required under the principles articulated in *Commonwealth* v. *Blood,* 400 Mass. 61,

[4]Although the defendant filed a motion to suppress his post-Miranda statements, the subject of the defendant's second argument herein, the motion did not include any claim related to the electronically intercepted conversation. The claim is therefore waived, and this court need not consider it on appeal. See *Commonwealth* v. *Costa,* 65 Mass. App. Ct. 227, 232-233 & nn.4-7 (2005).

66-67 (1987).[5] The defendant interprets the *Blood* decision as bringing within the protective reach of art. 14 any conversation that takes place in any private home. While there is some language in *Blood* that intimates such a broad reading of art. 14, *id.* at 70, the facts underlying the decision and the subsequent cases interpreting it make clear that such a conversation is not automatically entitled to constitutional protection merely because of where it occurred.

In *Blood*, a government informant wore a concealed transmitter during meetings with the two defendants (Blood and Lorenzen) and others involved in a conspiracy to burglarize bars of gold from a commercial establishment. *Id.* at 62-64. "No warrant was sought." *Id.* at 64. Over the course of twelve days, seven conversations were transmitted, three of which were recorded and used by the prosecution at the defendants' joint trial. *Id.* at 64-65. Two of the conversations admitted in evidence had taken place at Lorenzen's home and the third conversation had taken place at the home of Novia Turkette, Jr., the purported leader of the criminal organization behind this and various other crimes on the North Shore. *Id.* at 63-65. The government informant had known Turkette and his father for about fifteen years, and Turkette had posted the informant's bail in the past on unrelated charges. *Id.* at 63 n.4.

Based on these circumstances, the court reasoned that because the conversations at issue were held in private homes and included only friends or close associates, it was reasonable for the participants to expect that what was said would not become more widely known. *Id.* at 68-69. The court further held that "it is objectively reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording." *Id.* at 70.

The *Blood* majority detailed the basis for its decision. It stated that art. 14 "was intended by its drafters not merely to protect the citizen against 'the breaking of his doors, and the rummaging of his drawers,' *Boyd* v. *United States*, 116 U.S. 616, 630 (1886); but also 'to protect' " each citizen in their "right to bring thoughts and emotions forth from the self in

---

[5]That the evidence was introduced during rebuttal does not alter the analysis. See *Commonwealth* v. *Fini*, 403 Mass. 567, 573 (1988).

company with others doing likewise, the right to be known to others and to know them, and thus to be whole as a free member of a free society." *Commonwealth* v. *Blood*, 400 Mass. at 69. Viewed against this background, the conversations conducted in the homes of Lorenzen and Turkette, among individuals who had been friends or close associates for fifteen years, were of the character that the court concluded ought to be protected.

In subsequent decisions involving the warrantless seizure of conversations by electronic surveillance, courts have concluded that the same privacy concerns were not implicated when the circumstances could be distinguished from those present in *Blood*. For example, in *Commonwealth* v. *Price*, 408 Mass. 668, 672-673 (1990), the defendant had discussed the purchase of a large quantity of drugs in a motel room rented by undercover officers he had never previously met. The negotiation, to which the defendant brought over $100,000 in cash, was surreptitiously recorded on audio and video tapes. The court recognized that while the defendant may have an expectation of privacy in his conversation in the motel room, such an expectation is not one society is prepared to accept as reasonable. *Ibid.* The defendant "engaged in an arm's[-]length business negotiation with strangers in a place over which he had neither control nor a right to control and which had been selected by the strangers." *Id.* at 672. Cf. *Commonwealth* v. *Netto*, 438 Mass. 686, 697 (2003) ("guest does not have any expectation of privacy in his hotel room once his rental period has expired"). Similarly, in *Commonwealth* v. *Collado*, 42 Mass. App. Ct. 464, 469 (1997), we held that the defendant "had no reasonable expectation of privacy while he was present in the apartment of an undercover narcotics officer with whom he had negotiated an arm's-length transaction for the sale of drugs"; the defendant and the officer were not "trusted friends," and their interaction was primarily centered on business.

Here, the circumstances surrounding the defendant's intercepted conversation are strikingly similar to those at issue in *Collado* and *Price*. The defendant had stopped at Tirado's apartment for a matter of minutes for the sole purpose of picking up a package. The two were neither close business associates nor close friends. The defendant had never previously been to Tira-

do's apartment, nor did he know where Tirado lived. The conversation that ensued was confined to a discussion of the package. In sum, the intercepted conversation exclusively concerned a business transaction, was engaged in by two individuals who were not close friends, and took place in a residence over which the defendant did not have control. The indicia of an expectation of privacy that were present in *Blood*, including lengthy conversations that took place over a period of days at the homes of longtime friends and business associates, are absent here. Here, the defendant lacked a reasonable expectation of privacy and, therefore, is unable successfully to challenge admission of the conversation.

Even if we were to conclude otherwise, the outcome of this case would remain unchanged. Trooper Colon's recollections of the intercepted conversation added little to the other substantial evidence of the defendant's guilt. In addition to the uncontested evidence that the defendant arrived at Tirado's home with the intent to pick up the package, the telephone calls that preceded his arrival demonstrated that the package was his.[6] When Tirado called the defendant and told him the package had arrived, the defendant's first response was, "[I]s it okay? Is everything okay with it?" Tirado confirmed that it was and urged the defendant to get "his" package because Tirado's wife was "pissed at him [Tirado], [and] wanted the package gone." The defendant's attempt to flee from the police before he was arrested further bolsters the evidence of guilt.

Moreover, Colon's recollections of the conversation at issue were sketchy at best. He remembered the defendant saying he would pay Tirado $400 (only $200 was found), and immediately after that he heard money being counted. He also heard someone say "Help me out." There was a pause, but Colon could not make out what was going on. In response to leading questions, Colon testified that he did not hear Tirado ask for a loan, but that testimony did not foreclose the possibility that such a request had been made. In the circumstances, the admission of the intercepted conversation, even if error, did not cause a substantial risk of a miscarriage of justice.

---

[6]There is no objection on appeal to Garcia's testimony reciting the content of the three telephone calls between Tirado and the defendant, in which the details of the pick-up were arranged.

b. *Closing argument.* Similarly, we reject the defendant's contention that the prosecutor improperly used the rebuttal evidence for a substantive purpose in his closing argument.[7] To the extent that the prosecutor urged the jury to conclude that Tirado was credible because the monitoring device would permit the police to detect if he had lied to them, the argument was based on the fair inferences that could properly be drawn from the evidence that was adduced during the Commonwealth's case-in-chief. There was no error.

c. *Applicability of G. L. c. 272, § 99 O 2.* The defendant also argues that G. L. c. 272, § 99 O 2, as appearing in St. 1968, c. 738, § 1, which outlines service procedures for evidence garnered in the one-party exception situation set forth in the wiretap statute, mandated exclusion of Colon's testimony regarding the conversation at issue. Section 99 O 2 provides in pertinent part: "In any criminal trial where the commonwealth intends to offer in evidence any portions of [certain types of] recording[s] or transmission[s] or any evidence derived therefrom . . . the defendant shall be served with a complete copy of each recording or a statement under oath of the evidence overheard as a result of the transmission. . . . [The failure to make such service thirty days before trial] shall render such service illegally obtained . . . and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or rules of court." The statute's exclusionary

---

[7]The portion to which the defendant refers, and which drew no objection, is as follows:

"[The defendant] goes into the apartment and has conversation with Peter Tirado. That conversation is monitored, ladies and gentlemen of the jury. It is being supervised. It is being verified. Peter Tirado does not have the ability to ask for a $200 loan. Not consistent with what he told police. He can't do that. If he does that, the police know at that point in time that he's lying. [The defendant] took that package, ladies and gentlemen. He took it because he knew what was in it. He took it because he hired Peter Tirado to take custody of it. Even tried to kind of gyp him on the money. He paid for it. He paid $200 for it. That's an extraordinary amount of money to pay someone to take delivery of a package. And that, ladies and gentlemen of the jury, is all circumstantial evidence which establishes [the defendant's] knowledge of what he was picking up."

provision, however, is not self-executing. While a formal motion to suppress is unnecessary, see *Commonwealth* v. *Picardi*, 401 Mass. 1008, 1009 (1988), defense counsel nonetheless must direct the judge to the provision in some manner. See *Commonwealth* v. *Flemmi*, 2 Mass. App. Ct. 533, 541 (1974). Here, "[t]he possibility of a violation of G. L. c. 272, § 99(O)(2), was never even suggested to the trial judge," and thus cannot be raised as an "afterthought" for the first time on appeal. *Ibid.*[8]

2. *Post-Miranda statement.* The defendant argues that his motion to suppress his statement to Trooper Daniel Soto was improperly denied. After conducting an evidentiary hearing, the trial judge denied the motion the day before trial began. The facts adduced at that hearing and not disputed on appeal are as follows.

When the defendant arrived at the Springfield police station, he was handcuffed inside the holding cell. Trooper Soto accompanied another officer into the cell and began speaking with the defendant in Spanish. He read the defendant another set of Miranda warnings before making "small talk" with him about, among other things, the defendant's Puerto Rican heritage. After Trooper Soto sat down next to the defendant, the defendant looked at him and said, "Wait a minute. If you think I am going to cooperate, don't waste your time. You chose to be a police officer, you chose to be to be a cop, that is your job. I chose my job, I will do my time," or words to that effect. Trooper Soto discontinued his conversation with the defendant and got up and left.

The judge found that Soto discontinued the conversation because the defendant had invoked his right to silence, but the "invocation was not a simple invocation of the right to remain

---

[8]The failure to raise the issue below creates the additional hurdle of an inadequate record. Because the judge was not afforded the opportunity to rule on the issue of service, the record does not supply the necessary "factual predicate" to determine whether the statements were timely provided to the defendant and, in turn, whether the evidence was admitted in contravention of the statute. See *Commonwealth* v. *Westerman*, 414 Mass. 688, 699 (1993) (affirming determination of trial judge that service was made within the requisite time period under § 99 O where record's lack of clarity failed to support the defendant's claim); *Commonwealth* v. *Campiti*, 41 Mass. App. Ct. 43, 68-69 (1996).

silent; it was the voluntar[y], although perhaps spontaneous and ill-advised statement to the police officer that went beyond the invocation of his right to remain silent, especially that it was not in response to any question of the police officer." The judge ruled that because the defendant had been advised of his Miranda rights and had freely and voluntarily waived those rights in making the statement, it was admissible.

At trial, the prosecutor mentioned the statement in his opening remarks, and Soto testified to the statement during the Commonwealth's case-in-chief, over the defendant's objection. The prosecutor also referred briefly to the statement in his summation. Following closing arguments, the judge, on her own initiative, suggested that she provide a cautionary instruction. The judge outlined the proposed instruction, which would inform the jury that they were not permitted to draw any adverse inference from the defendant's statement to the effect that he did not want to talk to the police, and that they could only consider whether the defendant actually spoke to police, and whether the statement was an admission of guilt. Defense counsel requested that that instruction be given, and in her final instructions, the judge charged the jury accordingly. The defendant did not object.

On appeal, the defendant claims that the admission of his statement to Trooper Soto, over his objection, violated the principles set forth in *Doyle* v. *Ohio*, 426 U.S. 610 (1976). The crux of a *Doyle* violation is the government's use of "a defendant's post-Miranda silence for the purpose of impeaching an exculpatory story advanced at trial by a defendant." *Commonwealth* v. *McClary*, 33 Mass. App. Ct. 678, 684 (1992).

In context, the defendant's statements are not enough to qualify as the invocation of a right to cut off questioning. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 733-734 (1990) (defendant's refusal to answer certain questions was not an assertion of right to remain silent); *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant's statement that "he had nothing else he could say" and his thinking out loud as to whether he should talk did not amount to invocation of right to remain silent). The defendant's statement could properly have been understood as saying not

that he would not talk to Soto, but that he would not assist the police by implicating his suppliers or accomplices to get favorable treatment for himself. Trooper Soto testified that he understood the defendant's statement as indicating that he did not want to help the police "get bigger fish."

The judge's ruling is not to the contrary. While she characterized the defendant's initial refusal to cooperate as an invocation of the right to silence, she concluded that his subsequent statement "went beyond" this invocation. The ruling properly reflects the reasoning in the decisional law that although a defendant may say something while he is in custody that may be interpreted as a desire to cut off questioning, when the defendant supplements that statement with additional remarks that do not convey the same sentiment, as occurred here, it is insufficient to invoke the right to silence. See generally *Commonwealth* v. *Roberts*, 407 Mass. at 733-734; *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. at 671; *Commonwealth* v. *Selby*, 420 Mass. 656, 660-662 (1995). "For the rule of Miranda regarding the termination of questioning to apply, there must be . . . an expressed unwillingness to continue." *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984). That was absent here.

In any event, even if the defendant's initial statement indicating a refusal to cooperate is viewed as an invocation of his right to remain silent, his subsequent inculpatory remarks were spontaneous and without provocation and were therefore properly admitted. "Spontaneous and unprovoked statements are admissible even if made after a defendant has invoked his right to remain silent." *Commonwealth* v. *Brum*, 438 Mass. 103, 115 (2002). Finally, even if we were to conclude there was error, it was cured by the judge's limiting instruction.

3. *Jury instructions and sufficiency of the evidence.* The judge instructed the jury on two theories of cocaine trafficking: possession with the intent to distribute, and "bringing into" the Commonwealth. See G. L. c. 94C, § 32E(*b*)(4). The judge also told the jurors that they had to be unanimous as to either or both theories, but there was no special verdict form. On appeal, the defendant argues that there was insufficient evidence that he brought the cocaine into the Commonwealth and that the judge,

in instructing the jury on this theory, impermissibly deviated from the statutory language.[9]

The judge instructed the jury, without objection, that the "bringing in" theory required the Commonwealth to prove that the defendant "caused the cocaine to be brought into the Commonwealth or brought the cocaine into the Commonwealth." In *Commonwealth* v. *Manrique*, 31 Mass. App. Ct. 597, 604 (1991), we held that guilt under the "bringing in" theory required "satisfactory proof that (i) the cocaine was brought into the Commonwealth from someplace outside and (ii) the defendant in some manner participated in the act of importing." Here, the judge placed a greater burden on the Commonwealth than is required by the *Manrique* case. Instead of requiring mere *participation* in the importation of the cocaine to establish the defendant's guilt, the judge required the Commonwealth to prove that the defendant either caused the cocaine to be brought into the State or himself brought the cocaine in. Thus, we agree with the Commonwealth that the more restrictive language used by the judge was advantageous to the defendant and did not create error.

Viewing the evidence in the light most favorable to the Commonwealth, including all reasonable inferences, a rational jury could have found beyond a reasonable doubt that the defendant caused the cocaine to be brought into the Commonwealth. See *Commonwealth* v. *Shore*, 65 Mass. App. Ct. 430, 432 (2006). Tirado accepted the defendant's offer to pay him $400 to accept delivery of a package. A package originating from Colombia was subsequently delivered to Tirado's temporary residence, addressed to Tirado, about a week or a week and one-half later. The defendant retrieved the package, which contained almost 900 grams of cocaine, from Tirado's residence after being informed of its arrival. He paid Tirado one-half of the money owed for receiving the package and promised to remit the remaining $200 at a later date. The defendant attempted to evade police capture after securing the package, and a search of

---

[9]At trial, the defendant moved for a required finding of not guilty at the close of the Commonwealth's evidence and again at the close of all the evidence. The defendant argued only that the evidence was insufficient to show that he knew the package contained cocaine.

his person revealed over $1,000 in cash. After his arrest, he told Trooper Soto that he had "chose[n his] job" and that he would "do [his] time." A jury could have reasonably inferred from this statement that the defendant was prepared to receive a prison sentence for drug trafficking. Taken together, the evidence reflects that the defendant handled all aspects of the cocaine's importation save signing for the package. Even under the higher standard for a conviction imposed by the jury instruction, the Commonwealth met its burden.

Finally, where, as here, the evidence is sufficient to sustain a guilty verdict under both theories, there is no merit to the defendant's contention that it was error to submit a general verdict form to the jury. See *Commonwealth* v. *Muckle*, 59 Mass. App. Ct. 631, 641-642 (2003) ("[w]here only a general verdict slip is submitted to a jury, a conviction will be affirmed provided there is sufficient evidence to sustain both theories").

Each of the defendant's claims of error being meritless, his conviction of trafficking in cocaine in excess of 200 grams must be affirmed.

*So ordered.*