SUPERIOR COURT 
 
 COMMONWEALTH vs. ALBERTO SANTANA

 
 Docket:
 1977CR00458
 
 
 Dates:
 February 24, 2021
 
 
 Present:
 Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss. 
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS POLE CAMERA EVIDENCE (Paper Nos. 20 and 23)

 
 

             As the result of a long-term investigation by police of a sophisticated drug trafficking organization that allegedly operated in Lawrence and Methuen, the Commonwealth obtained indictments in 2019 against defendant Alberto Santana (“Santana”) and sixteen other members of the alleged drug trafficking organization. He is charged with drug trafficking and firearms offenses arising from the police investigation.
            On August 6, 2020, the Supreme Judicial Court ruled in Commonwealth v. Mora, 485 Mass. 360 (2020), for the first time that the continuous surveillance of a person’s residence by police for more than two months by use of a pole camera is a “search” under Article 14 of the Massachusetts Declaration of Rights and, prospectively, requires a search warrant. Id. at 376.
            In this case, Santana has moved to suppress evidence generated from pole cameras used by police to surveil his two residences in Lawrence located at 15 – 17 Ames St. and 81 Stearns Avenue.[1] More specifically, Santana seeks to suppress the
---------------------------
[1] As stated below, the police used so-called “car cameras” to surveil Ames St. on April 13 to April 19, 2019, which preceded the deployment of the pole camera at that location, and on May 22 to 29, 2019, which the police deployed concurrently with the pole camera. However, Santana does not challenge the legality of the use of the car cameras and he does not seek to suppress any video footage or observations made therefrom.
 
                                                            -1-
 
camera footage and police observations thereof, which the police used, inter alia, to obtain search warrants for the two homes. Thus, the parties ask the Court to determine if the Commonwealth met its burden under Mora to establish, generally speaking, that the officers had probable cause when they installed each of the pole cameras in 2019.
            On October 27, 2020, and February 17, 2021, the Court conducted an evidentiary hearing on Defendant’s Supplemental Motion To Suppress Evidence In Light Of The Court’s Decision In Mora (“Ames St. Motion”) (Paper No. 20) and Defendant’s Motion To Suppress Pole Camera Evidence Used To Obtain The Search Warrant For 81 Stearns Street (“Stearns Ave. Motion”) (Paper No. 23).[2]
            At the hearing on October 27, 2020, the Court received two exhibits in evidence: (i) (supplemental) Affidavit of Robert C. Noonan (Exhibit 1) (“Supplemental Affidavit”), offered by the Commonwealth; and, (ii) Application For An Order And Warrant To Intercept Certain Oral And/Or Wire Communications Over Telephone Service
---------------------------
[2] Some information about the procedural background of this case is appropriate.
Regional Administrative Justice Drechsler specially assigned the undersigned judge to handle all proceedings involving Santana and his sixteen co-defendants. Pursuant to that authority, on July 21, 2020, the Court conducted an evidentiary hearing on Defendant’s Motion To Suppress Evidence And Evidentiary Hearing (Paper No. 7), in which Santana sought to suppress evidence seized by the police pursuant to a search warrant at 15 – 17 Ames Street. That motion to suppress evidence was filed prior to the SJC’s decision in Mora. The police used observations they made via the pole cameras in their application for the search warrant. This Court denied the motion to suppress evidence obtained via the search warrant, but granted Santana leave to seek suppression of evidence derived from the pole camera surveillance pursuant to Mora. See the Memorandum of Decision and Order at Paper No. 21.
Thereafter, as stated, on October 27, 2020, this Court conducted a hearing on Santana’s two motions to suppress pole camera evidence and took the matter under advisement. However, on October 29, 2020, this Court issued Procedural Order No. 2 (re: Mora Hearings) (see Paper No. 24 in No. 1977CR00453), in which it granted Santana leave to request further proceedings and submit additional evidence in support of his two motions to suppress pole camera evidence. Santana sought such leave and this Court conducted a further hearing on February 17, 2021.
 
                                                            -2-
 
Numbered 617-380-9599 Pursuant To G.L. c. 272, § 99 (Exhibit 2) (“Wiretap Application 1”), offered by Santana.[3]
            At the hearing on February 17, 2021, Santana submitted the following additional evidence for the Court’s consideration: (i) thumb drive containing short portions of three videos captured by the car camera deployed by police on Ames St. (Exhibit 3); (ii) list of electronic surveillance locations (Exhibit 4); (iii) Affidavit of Sgt. Daniel P. Clemens and Trooper Robert C. Noonan In Support Of Application For Warrant For Electronic Surveillance Pursuant To G.L. c. 272, § 99, dated April 8, 2019 (Exhibit 5); (iv) Affidavit of Sgt. Daniel P. Clemens and Trooper Robert C. Noonan In Support Of Application For Warrant For Electronic Surveillance Pursuant To G.L. c. 272, § 99, dated April 22, 2019 (Exhibit 6); and, (v) Application For An Order And Warrant To Intercept Certain Oral And/Or Wire Communications Over Telephones Numbered (603)275-2879 . . . Pursuant To G.L. c. 272, § 99 (Exhibit 7).
            As is fully explained below, after thorough consideration of the Supplemental Affidavit, the other Exhibits, the parties’ submissions, and arguments of counsel, the Ames St. Motion and the Stearns Ave. Motion are DENIED.
---------------------------
[3] Santana offered the Warrant Application 1 as an exhibit. It contains, inter alia, the Affidavit Of Sergeant Daniel P. Clemens And Trooper Robert C. Noonan (“Wiretap Application 1 Affidavit”).
 
                                                            -3-
 
FINDINGS OF FACT
            The Court makes the following findings from the facts set forth in the Supplemental Affidavit and reasonable inferences drawn therefrom.[4]
            1.  Overview Of Investigation
            In spring 2017, Trooper Robert Noonan (“Noonan”) and Sgt. Daniel Clemens (“Clemens”) of the Massachusetts State Police (“MSP”), and other investigators began investigating a narcotics distribution network in the Lawrence area. The initial target of the investigation was Robinson Adames Abreu (“Adames Abreu”), who investigators suspected was selling fentanyl, heroin, and cocaine in the Lawrence area. Investigators learned cellular telephone numbers used by Adames Abreu, and identified Jhony Mota- Rodriguez and Jose Lugo-Garcia as “runners” he used to deliver narcotics to buyers.
            Clemens eventually arranged and conducted eleven undercover purchases of narcotics from Adames Abreu and his runners. Investigators suspected Adames Abreu used an auto body garage located at 333 Methuen St., Lawrence (“Garage”) to sell and store (“stash”) narcotics.
            2. Continuing Investigation And Initial Wiretap Warrants
            On March 25, 2019, investigators obtained an order from a Superior Court judge (“Judge”)[5] that authorized the interception of communications over a cellular telephone number (i.e., a “wiretap warrant”) used by Adames Abreu. Immediately thereafter
---------------------------
[4]  The Court sets forth additional findings of facts in the Conclusions of Law section, infra.
[5] The same Superior Court judge (Lang, J.) authorized all of the search warrants and wiretap warrants obtained by police during the investigation.
 
                                                            -4-
 
investigators intercepted communications during which Adames Abreu engaged in the distribution of narcotics.[6]
            3.  Police Identify Santana As A Narcotics Supplier
            Through the intercepted communications, investigators quickly determined that a person later identified (i.e., on April 9, 2019) as Santana supplied narcotics to Adames Abreu.
            For example, on March 26, 29, and 30, 2019, investigators intercepted multiple communications between Santana and Adames Abreu during which Adames Abreu requested additional time to pay Santana money for a previous narcotics purchase and Adames Abreu complained about the quality of the narcotics Santana previously supplied. Santana told Adames Abreu that he would ask “these people” about giving Adames Abreu additional time to pay the money owed. Shortly thereafter, Santana told Adames Abreu that “they” gave him (Santana) a few additional days to collect the drug debt. Later, Santana told Adames Abreu that he “called [his] people” regarding Adames Abreu’s complaints about the quality of the previously sold narcotics, but he was told it was too late to address the complaints. Based on these communications in late March 2019, the police reasonably believed Santana was an active member of a drug trafficking organization and that he reported to higher-ranking members.
            On April 2 and 3, 2019, officers intercepted communications during which Santana and Adames Abreu discussed collecting the money owed, and Santana reported that “those people are mad” and are “pressur[ing]” him to collect the money.
 
---------------------------
[6] The Supplemental Affidavit contains excerpts from transcripts of numerous communications intercepted by police pursuant to several wiretap warrants.
 
                                                            -5-
 
            On April 8, 2019, the Judge renewed the wiretap warrant for Adames Abreu’s telephone number, and authorized wiretap warrants for a cellular telephone number used by Santana and another number used by Adames Abreu.
            By early April 2019, investigators reasonably determined from intercepted communications, surveillance, and location data[7] that Santana was a member of a highly organized, sophisticated drug trafficking organization (“DTO”), and that the source of fentanyl and cocaine Santana sold to Adames Abreu and others came from members of the DTO. Officers also reasonably concluded that Santana collected money from Adames Abreu and other buyers on behalf of the DTO.
            4.  Operative Events Regarding Santana’s Nexus To The Two L ocations At Issue
            By at least April 12, 2019, the police reasonably believed that Santana lived at 81 Stearns Ave. and used a location near 15-17 Ames St. to “stash” narcotics.
            For example, using CSLI from Santana’s cell phone, police determined his cell phone was at 81 Stearns Ave. from 9:45 p.m. on April 8, 2019 to 11:04 a.m. on April 9. While Santana was there during the late morning on April 9, officers intercepted Santana discussing a shipment of narcotics he was awaiting. Shortly thereafter, location data placed Santana’s cell phone near 15–17 Ames St. (i.e., on April 9, 2019, from 11:19 a.m. until 12:19 p.m.). While Santana was present at that location, officers intercepted communications during which Santana received information that the shipment of fentanyl he was awaiting had arrived, and he discussed meeting UM6681[8]
 
---------------------------
[7] The location data included cellular site location information (“CSLI”), which the Judge authorized the police to collect.
[8] In the Supplemental Affidavit, unidentified males were referred to as “UM” and the last four digits of their telephone number.
 
                                                            -6-
 
at the location with money to pay for the shipment. Shortly thereafter, officers observed Santana enter a motor vehicle near 81 Stearns Ave. and drive away.[9] Shortly thereafter, location data placed Santana’s cell phone near 15-17 Ames St., and then officers observed Santana near the Garage and intercepted him asking Adames Abreu to “open” up. Based on this information, officers reasonably believed that Santana picked up fentanyl from a supplier and delivered it to Adames Abreu at the Garage. After the delivery, officers observed Santana, Adames Abreu, and Mota-Rodriguez exit the Garage (at different times), and location data showed Santana’s cell phone returned to 15-17 Ames St. and stayed there for approximately 45 minutes. During that time, officers intercepted Santana communicating with a narcotics purchaser who complained about the quality of narcotics Santana previously sold and Santana arranged the sale of a kilogram of fentanyl to that buyer. Shortly thereafter, location data placed Santana’s cell phone at 81 Stearns Ave.
            Also on April 9, 2019, officers intercepted Santana discussing a sale of narcotics to UM1920. On April 10, 2019, location data placed Santana’s cell phone in the area of 15-17 Ames St. for approximately 90 minutes. During that time, officers intercepted Santana coordinating the sale of narcotics to UM1920 that officers heard Santana and UM1920 discuss the previous day. Location data then placed Santana’s cell phone in the area of 81 Stearns Ave. during which he arranged to meet UM1920 “in fifteen minutes.” Shortly thereafter, location data placed Santana’s cell phone near the Garage. Thus, the police reasonably believed Santana consummated the narcotics sale to UM1920 near the Garage.
 
---------------------------
[9] Police learned the motor vehicle, a Chevy Silverado, was registered to Santana at 81 Stearns Ave., along with another vehicle.
 
                                                            -7-
 
            During late morning on April 11, 2019, location data placed Santana’s cell phone at the Garage. While there, officers intercepted Santana arranging another sale of narcotics to UM1920 “in less than an hour.” Shortly thereafter, location data placed Santana’s cell phone in the area of 15-17 Ames St.
            During late morning on April 12, 2019, officers intercepted UM1920 ordering cocaine from Santana while location data placed his cell phone at 81 Stearns Ave. Shortly thereafter, location data placed Santana’s cell phone near 15-17 Ames St. and officers intercepted Santana telling UM1920 that he was “almost there” and would “be there in two minutes” with “the blanco” (i.e., the cocaine). Location data then showed that Santana’s cell phone moved away from Ames Street.
            On April 12, 2019, at 11:46 p.m., officers intercepted a text message sent to Santana’s cell phone while it was located at 81 Stearns Ave. in which the sender requested to purchase narcotics from Santana “tomorrow.” Santana replied, “Ok[a]y.”
            5.  Video Surveillance At 15–17 Ames St., Lawrence, MA
            On April 13, 2019, officers deployed a car camera on Ames Street.[10] [11] At that time, officers were unsure of the exact location on Ames St. Santana used as a stash house, although they believed it was near or at 15-17 Ames St. given the aforementioned CSLI and location data. From that camera, which the police removed
 
---------------------------
[10] A car camera is a camera installed in a police vehicle that streams and records video images. Here, the car cameras used by the investigators on Ames St. did not capture any sound and did not have night vision capability. Officers were able to watch the video in “real time” (i.e., “live”). During the “live” feed, officers could remotely change the viewing angle of the camera and zoom in on things. The car camera also recorded the video images, but officers had no ability to change the viewing angle of the camera or zoom in on things.
[11] Although the Supplemental Affidavit states that officers first made observations from the car camera on April 13 at 12:19 p.m., it does not state the time at which the police deployed the car camera.
 
                                                            -8-
 
on April 19, 2019,[12] officers made observations of part of the building at 15-17 Ames St. through the live video feed and video recordings.
            On April 19, 2019, officers installed a pole camera on a utility pole on Ames St. and aimed it at 15–17 Ames Street.[13] [14]
            On May 22, 2019, officers deployed another car camera on Ames St. and removed it on May 29, 2019.[15]
            On June 26, 2019, officers removed the pole camera.[16] Thus, the police conducted continuous video surveillance of 15–17 Ames St. via the pole camera for 69 days (i.e., April 19, 2019, at 12:01 a.m. to June 26, 2019).[17]
 
---------------------------
[12] The Supplemental Affidavit does not state the date upon which the police removed the car camera; however, at the hearing, the Commonwealth represented that the police removed the camera on April 19, 2019.
[13] A pole camera is a camera installed by police on a utility pole. Here, like the car camera, the pole cameras used by police near the two subject addresses did not capture any sound and did not have night vision capability. Officers were able to watch the video in “real time” (i.e., “live”). During the “live” feed, officers could remotely change the viewing angle of the camera and zoom in on things. The pole cameras also recorded the video images, but officers had no ability to change the viewing angle of the camera or zoom in on things.
[14] The Supplemental Affidavit does not state the time at which the police installed the pole camera near 15–17 Ames Street. Thus, for purposes of its analysis, the Court will assume that police installed the pole camera at 12:01 a.m. on April 19, 2019.
[15] The Supplemental Affidavit does not state that the police deployed a second car camera on Ames Street. However, at the hearing, the Commonwealth represented that the police did so, and provided the dates of deployment and removal.
[16] At the hearing, the Commonwealth represented that the police removed the camera on June 26, 2019.
[17] The Court recognizes that for 8 days during this period (i.e., from May 22 to May 29, 2019), the police simultaneously deployed a car camera and a pole camera on Ames Street.
 
                                                            -9-
 
            6.  Video Surveillance At 81 Stearns Ave., Lawrence, MA
            Officers reasonably concluded from location data from Santana’s cell phone that Santana stayed overnight at 81 Sterns Ave. on April 9, 10, 11, and 12, 2019.
            On April 26, 2019, police installed a pole camera on a utility pole and pointed it at 81 Stearns Avenue.[18]
            On June 26, 2019, officers removed the pole camera.[19] Thus, the police conducted continuous video surveillance of 81 Stearns Ave. via the pole camera for 62 days (i.e., April 26, 2019 at 12:01 a.m. to June 26, 2019).
C ONCLUSIONS OF LAW
            As stated, Santana seeks the suppression of all observations made by police from the pole cameras and the video footage. The parties agree that the Court’s decision is controlled by Mora. Thus, the Court will start its analysis with an overview of the legal framework announced in Mora.
I. THE MORA LEGAL FRAMEWORK
            “Article 14, like the Fourth Amendment to the United States Constitution, guarantees ‘a right to be secure from all unreasonable searches … and seizures.’” Commonwealth v. Buckley, 478 Mass. 861, 865 (2018). “‘Under both the Federal and Massachusetts Constitutions, a search in the constitutional sense occurs when the government’s conduct intrudes on a person’s reasonable expectation of privacy.’” Mora, 485 Mass. at 364 (citation omitted). “To show that the use of pole cameras in this case
 
---------------------------
[18] The Supplemental Affidavit does not state the time at which the police installed the pole camera. Thus, for purposes of its analysis, the Court will assume that police installed the pole camera at 12:01 a.m. on April 26, 2019.
[19] At the hearing, the Commonwealth represented that the police removed the camera on June 26.
 
                                                            -10-
 
was a ‘search’ under art. 14, the defendant[] bear[s] the burden of establishing that (1) [he] ‘manifested a subjective expectation of privacy in the object of the search,’ and (2) ‘society is willing to recognize that expectation as reasonable.’” Id. at 366 (citations
omitted).
            The SJC ruled in Mora that two of the three defendants before it met their burden under Article 14 to establish that “they manifested a subjective expectation of privacy in the aggregate of their activities captured by the security cameras” by “fil[ing] affidavits in which they stated that they did not expect to be surveilled coming and going from their homes over an extended period.”[20] I d. at 366. The SJC further ruled that the two defendants’ expectation of privacy in their comings and goings from their homes for more than two months “is one that society would regard as ‘reasonable,’ ‘justifiable,’ or ‘legitimate.’” Id. at 368 (citation omitted). Hence, the SJC held that the continuous police surveillance by use of a pole camera of a “residence[] for more than two months [i]s a ‘search’ under art. 14” and police must obtain a search warrant.[21] I d. at 376.
 
---------------------------
[20] With respect to the third defendant in Mora, the SJC ruled he “presented no direct evidence that he manifested a subjective expectation of privacy” because, “[a]lthough he filed an affidavit in support of his motion to suppress, he did not explicitly state within it that he expected his movements to go unobserved.” Id. at 366.
[21] The SJC in Mora relied solely on Article 14 and did not reach the question of whether the pole camera surveillance was a “search” under the Fourth Amendment. Id. at 361. In this case, Santana does not argue that the Fourth Amendment is more protective than Article 14.Nevertheless, our appellate courts likely would not credit such an argument. See e.g., Commonwealth v. Upton, 394 Mass. 363, 373 (1985) (“art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause” to obtain a search warrant).
 
                                                            -11-
 
            In announcing the “new rule” in Mora requiring a search warrant for police surveillance of a residence for more than two months, the SJC recognized “that police departments across the country have used pole cameras, without the need for a warrant, for at least three decades.” Id. (citations omitted). Therefore, the SJC ruled that:
On remand, the motion judge, at an appropriate hearing, must consider whether, at the time the pole camera surveillance began, the Commonwealth had “probable cause to believe [(1)] that a particularly described offense has been, is being, or is about to be committed, and [(2)] that [the pole camera] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense.” . . . [At the hearing, the Commonwealth] may be able to establish probable cause through affidavits submitted in support of warrants it [] obtain[ed] during the course of the investigation, such as for wiretaps. Alternatively, the Commonwealth may meet its burden through supplemental affidavits and other relevant evidence it may seek to proffer at a new evidentiary hearing. If the Commonwealth can show that investigators had probable cause when each of the pole cameras was installed, and thus were not acting in a wholly arbitrary manner, the motions to suppress should be denied in their entirety.
I d. at 377 (internal quotations and citation omitted) (emphasis added).
            With this framework in mind, the Court will address the propriety of the pole camera surveillance at issue here.
 
                                                            -12-
 
II. THE POLE CAMERA SURVEILLANCE OF THE TWO RESIDENCES WERE SEARCHES IN THE CONSTITUTIONAL SENSE UNDER ARTICLE 14
            Here, there is no dispute that the continuous video surveillance by police of 15- 17 Ames St. for 69 days and 81 Stearns Ave. for 62 days were “searches” under Article 14.[22]
III. THE COMMONWEALTH MET ITS BURDEN UNDER MORA TO ESTABLISH PROBABLE CAUSE TO JUSTIFY THE SURVEILLANCE
            Given that the parties agree “searches” in the constitutional sense occurred, the Commonwealth has the burden under the Mora two-prong standard to show that, at the time the police first installed the pole cameras at each of the two locations, the police had probable cause to believe: (1) that drug distribution crimes had been committed; and, (2) that the camera footage would produce evidence of such a crime or would aid in the apprehension of a person who the police had probable cause to believe was committing the crime. Mora, 485 Mass. at 377.
            Santana concedes that the police had probable cause to believe that Adames Abreu and others engaged in drug trafficking crimes before they first deployed the pole camera on Ames St. on April 19, 2019, and the pole camera on Stearns Ave. on April 26, 2019. Instead, Santana makes three arguments directed at the parameters of the burden required by the second prong of the Mora standard.
            First, Santana argues that the second prong of the Mora standard requires the Commonwealth to establish that, at the time of installing the pole cameras, the video
 
---------------------------
[22] Like two of the three defendants in Mora, Santana “manifested a subjective expectation of privacy in the aggregate of [his] activities captured by the security cameras” by “fil[ing] [an] affidavit[] in which [he] stated that [he] did not expect to be surveilled coming and going from [his] homes over an extended period.” Id. at 366. See Affidavit Of Defendant In Support Of Motion To Suppress Pole Camera Evidence at Paper No. 27.
 
                                                            -13-
 
surveillance would be useful in proving the drug conspiracy, and that the Commonwealth failed to meet that burden. Second, Santana contends that the second prong of the M ora standard should require a showing that the video surveillance was necessary to further the investigation, as is required under G.L. c. 272, § 99E3, to obtain a wiretap warrant. Lastly, Santana argues that the duration of the pole camera surveillance was unconstitutionally overbroad, and that this Court should order the suppression of all video footage and observations generated by the pole cameras beyond the first 24 days of video surveillance.
            For its part, the Commonwealth contends that it met its burden under the second prong of the M ora standard, and that Santana’s challenges regarding the scope of that standard are without merit. The Court agrees.
A. T he Commonwealth Met Its Burden Under The Second Prong Of The Mora Standard
            There is no reasonable dispute that, as of April 19, 2019, at 12:01 a.m. when the officers deployed the first pole camera at issue here (i.e., on Ames St.), police had abundant probable cause to believe that Adames Abreu, Santana, Mota-Rodriguez, and Lugo-Garcia committed and were committing drug trafficking offenses. Further, by that time, officers had ample probable cause to believe that Santana, Adames-Abreu, and others were engaged in an ongoing conspiracy to violate the Controlled Substances Act in violation of G.L. c. 94C, § 40.[23]
 
---------------------------
 
[23] “To sustain a conviction for conspiring to distribute [narcotics], the prosecution must [ ] introduce[] evidence tending to show that [the defendant] made an agreement with another person to distribute [narcotics].” Commonwealth v. Stoico, 45 Mass. App. Ct. 559, 562 (1998) (citations omitted).
 
                                                            -14-
 
            Moreover, as of April 19, 2019, at 12:01 a.m., the police had probable cause to believe that camera footage of the area near 15-17 Ames St. would produce evidence of the conspiracy a and would aid in the apprehension of Santana. By that time, the police had probable cause to believe that Santana was a member of the DTO, that he used a location near or at 15-17 Ames St. to “stash” narcotics, and that his comings and goings from the location would produce evidence of the conspiracy and would assist them in arresting him. As discussed above, on April 10 – 12, 2019, the police intercepted communications and collected location data that reasonably led police to believe that Santana was using a location near or at 15-17 Ames St. to stash narcotics or, at the least, had access to that location while engaging in the drug trafficking conspiracy.
            The police developed additional evidence of the drug trafficking conspiracy (and Santana’s participation in it) before April 26, 2019, at 12:01 a.m., when police installed the pole camera to surveil 81 Stearns Avenue. Well before that time, based on intercepted communications, the collection of location data, physical surveillance, and a search of information held by the Registry of Motor Vehicles, the police reasonably believed that Santana lived at the location, and that his comings and goings would produce evidence of the conspiracy and would assist police in arresting him.
            Based on this, the Court rules that the Commonwealth has met its burden to establish the two prongs of the Mora standard for each of the two instances of continuous video surveillance at issue here. The Court further rules that the police did “not act[] in a wholly arbitrary manner” when they conducted the continuous video surveillance in this case. Mora, 485 Mass. at 377. Nevertheless, the Court will address
 
                                                            -15-
 
the other arguments advanced by Santana regarding the scope of the second prong of the Mora standard.
B. T o The Extent That Mora Requires The Commonwealth To Prove That The Pole Camera Surveillance Would Be Useful To The Investigation, The Commonwealth Met That Burden
            Santana argues that implicit in the second prong of the Mora standard is a requirement that the Commonwealth must establish that, at the time of installation of the pole camera, video surveillance of the targeted residence would be useful (or helpful)[24] in proving the drug conspiracy, and that the usefulness outweighs his privacy interest in the long-term (i.e., more than two months) continuous police surveillance of his homes. Santana contends that the Commonwealth failed to meet that burden.
            Santana asserts that the genesis for the “usefulness” requirement is that a search must be reasonably conducted for it to pass muster under Article 14 (and the Fourth Amendment). Commonwealth v. Morales, 462 Mass. 334, 342 (2012) (citations omitted). He contends, correctly, that the determination of reasonableness “‘requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, . . . and the place in which it is conducted.’” Id. (citation
 
---------------------------
[24] Santana uses the terms “useful” and “helpful” interchangeably. For example, he argues in his supplemental memorandum of law (see Paper No. 32) that, in the context of CSLI and GPS monitoring, our appellate courts “have required the commonwealth to establish probable cause that the intrusion into the [d]efendant’s privacy will be helpful in solving or proving that crime.” See Commonwealth v. Jordan, 91 Mass. App. Ct. 743, 751 – 752 (2017) (“Because CSLI provides information solely about the whereabouts of the cellular telephone user at different times, the Commonwealth may obtain a search warrant for CSLI by establishing probable cause that the suspect committed a crime, that the suspect’s location would be helpful in solving or proving that crime, and that the suspect possessed a cellular telephone at the relevant times.”) (emphasis added). To the extent that the terms “useful” and “helpful” mean different things, those differences are not material to the Court’s analysis.
 
                                                            -16-
 
omitted) (emphasis added). Santana argues that the need for, i.e., the usefulness of, the video surveillance must outweigh the invasion of his privacy resulting from the continuous monitoring of the exterior of his residence for 69 days (in the case of 15 – 17 Ames St.).
            Santana points to paragraph Nos. 135 to 137 of the Supplemental Affidavit and argues that the Commonwealth failed to meet this “usefulness” burden. In paragraph Nos. 135 to 137, Noonan averred, inter alia, that: (a) the use of physical surveillance on “seasoned drug dealers” in a densely populated urban neighborhood risked exposing the investigation; (b) the use of surveillance via static cameras assists the investigation by concealing officers’ identities (and the investigation, itself), lessening the likelihood that targets will take action to avoid surveillance, allowing the quick identification of targets’ methods and identities, and improving the safety of investigators; and, (c) video surveillance allows officers to accurately document their observations by recording the images. Santana argues that these generalities are not sufficiently specific to the investigation in this case to demonstrate the use of video surveillance would be “useful” to the investigation prior to the start of the pole camera surveillance at issue.
            In general, the Court agrees with Santana that the second prong of the Mora standard implicitly requires the Commonwealth to show that, at the time the police installed the pole camera, video surveillance of the location would be helpful to apprehend the suspect or advance the investigation of the criminal activity for which the police had probable cause to believe occurred or was occurring. However, as stated, the Supplemental Affidavit is replete with such evidence. Further, the aforementioned averments in the Supplemental Affidavit cited by Santana, in fact, describe why the
 
                                                            -17-
 
video surveillance would be useful, if not necessary, to advance the investigation of the drug trafficking conspiracy.
            Moreover, in challenging the sufficiency of the evidence of “usefulness” in the Supplemental Affidavit, Santana contrasts averments made by Noonan in the Supplemental Affidavit about the efficacy of pole camera surveillance with averments Noonan and Clemens made in the Wiretap Application 1 Affidavit the Commonwealth submitted to the Judge on April 9, 2019, in support of the Commonwealth’s application for a wiretap of Santana’s cell phone number. For example, Santana points to the following excerpts from the Wiretap Application 1 Affidavit authored by Noonan and Clemens:
g. GPS Tracking and “Ping” Location Data: As discussed above, pursuant to the authority of search warrants, we have used GPS devices and “ping” location data to aid in surveillance.[25] GPS devices and “ping” data are integral investigative tools. However, their usefulness is limited because they do not provide information about the nature of the conspiracy or the hierarchy of Adames Abreu’s organization. To date, the use of GPS and “ping” data has brought investigators no closer to identifying UM9599 [later determined to be Santana], UM2864, or any other sources of supply for Adames Abreu or higher-ranking members of his organization. Furthermore, we have not been able to conclusively identify the location where Adames Abreu maintains his supply of heroin/fentanyl and cocaine.
h.  Pole Cameras: We have also been employing covert pole cameras in public locations in Methuen and Lawrence to monitor the comings and goings of Adames Abreu and his associates. Although this information, in conjunction with GPS and “ping” location data, has been useful in determining Adames Abreu’s daily routine, it has not brought us any closer to identifying UM955, UM2864, or any other suppliers for Adames Abreu. The use of fixed location
 
---------------------------
[25] A “ping” is a signal sent to a cellular telephone from a cellular tower or a mobile device capable of broadcasting a cellular signal, which allows officers to obtain CSLI in “real time.” See Commonwealth v. Fredericq, 482 Mass. 70, 77 – 78 (2019) (explaining that “CSLI monitoring of the cellular telephone tracked the defendant’s location when he was in the vehicle in much the same way as would GPS tracking of that vehicle.”).
 
                                                            -18-
 
cameras, like physical surveillance, is unlikely to conclusively identify additional conspirators or otherwise help determine the full nature and scope of the drug conspiracy under investigation.
Exhibit 2, ¶¶ 66(g) and (h); pp. 40 – 41 (emphasis added).
            Santana argues that the above excerpt in bold from the Wiretap Application 1 Affidavit is inconsistent with the aforementioned averments in the Supplemental Affidavit about the efficacy (i.e., usefulness) of camera surveillance. Santana argues that the inconsistencies establish that the Supplemental Affidavit lacks veracity. However, the challenged averments are, in fact, consistent. The challenged averments in the Supplemental Affidavit are generalities about the usefulness of camera surveillance, while the challenged averments in the Wiretap Application 1 Affidavit are a specific acknowledgement that soundless video images generated by pole cameras are unlikely to allow investigators to “conclusively” identify DTO members or learn the DTO’s methods and practices. To be sure, in the Wiretap Application 1 Warrant, the affiants state, “[the pole camera] information, in conjunction with GPS and ‘ping’ location data, has been useful . . .” Id. (emphasis added).[26]
            In sum, the Commonwealth proved that, at the time of installation of the pole cameras at issue, the usefulness of the pole camera surveillance outweighed the invasion of Santana’s privacy resulting from the continuous monitoring of the exterior of his residence for 69 days (in the case of 15 – 17 Ames St.).
 
---------------------------
[26] “Because [the Commonwealth] is not asserting an inconsistent position, the doctrine of judicial estoppel does not apply here.” Blanchette v. School Comm., 427 Mass. 176, 184 (1998); see also Spinosa v. Tufts, 98 Mass. App. Ct. 1, 5 (2020) (“claim of judicial estoppel generally requires the showing [that] . . . the party to be estopped is asserting a position that is ‘directly contrary’ to a[n] [earlier] position.”).
 
                                                            -19-
 
C. T here Is No Basis To Believe That, If Presented With The Argument, The SJC Would Require The Commonwealth To Show That The Video Surveillance Is A Necessary Investigative Technique When Seeking A Search Warrant
            Santana argues that the second prong of the Mora standard should require a showing that, at the time of installation, the video surveillance was a “necessary” investigative technique, which is required under G.L. c. 272, § 99E3, to obtain a wiretap warrant. He further contends that the video surveillance here was not necessary given the alternative investigatory techniques that allowed the gathering of similar evidence, such as GPS tracking and wiretaps. The Court disagrees.
            The wiretap statute provides that a wiretap “warrant may issue only . . . [u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried.” G.L. c. 272, § 99E3. “Th[is] necessity requirement is meant to ‘assure that wiretapping is not resorted to in situations where traditional investigative techniques would have been sufficient to expose the crime.’” Commonwealth v. Fenderson, 410 Mass. 82, 83 (1991) (citation
omitted). However, Santana has not cited any appellate decisions in support of his argument and, as best as the Court can tell, the necessity requirement is solely a statutory prerequisite and not required by our common law or any constitutional provision. Moreover, the SJC has never even alluded to such a requirement when presented with an opportunity to impose one when, for e.g., deciding the propriety of the search of computers and cell phones which often contain highly personal private information.[27] See e.g., Commonwealth v. Keown, 478 Mass. 232, 239 (2017)
 
---------------------------
[27] The Court observes that, in the wiretap context, the SJC has long held that “several specific reasons for the failure of alternative methods of collection          more than adequately satisfy the statutory requirement of necessity.” Commonwealth v. Westerman, 414 Mass. 688, 693 (1993) (citations omitted). Those specific reasons include many of the factors raised in paragraph Nos. 135 – 137 of the Supplemental Affidavit, such as “‘counter-surveillance,’ identification of undercover operatives, the failure of witnesses to testify, the number of individuals and locations involved, and the inability of informants to reach the leaders of the conspiracy.” Id.
 
                                                            -20-
 
(“Searches of the ‘many files’ on electronic devices, such as computers and smart cellular telephones, ‘must be done with special care and satisfy a more narrow and demanding standard’ than searches conducted in the physical world.”) (citation omitted).
            In sum, Santana has failed to establish any basis to believe that, if presented with the argument, the SJC would require the Commonwealth to show that the pole camera surveillance is a necessary investigative technique when seeking a search warrant for pole camera surveillance.
D. The Duration Of The Pole Camera Surveillance Was Not Unconstitutionally Overbroad
            Lastly, Santana argues that “the duration of the pole camera surveillance was unconstitutionally overbroad because the [Supplemental Affidavit] did not establish probable cause to justify two (2) months of continuous and prolonged video surveillance.” (See Defendant’s Supplemental Memorandum Of Law, § III) (Paper No. 32). He contends that the purported overbreadth of the period of surveillance is akin to a general search which is unconstitutional. Thus, Santana requests the Court to order the suppression of all video footage and observations generated by the pole cameras beyond the first 24 days of surveillance.[28] However, Santana’s argument fails to appreciate that the Supplemental Affidavit establishes that police sought to use pole camera surveillance to investigate an active, ongoing drug trafficking conspiracy. Thus, his reliance on cases in which the SJC found that the Commonwealth obtained
 
---------------------------
[28] Santana argues that the “partial suppression” of the video surveillance, i.e., surveillance gathered after the twenty-fourth day, is a “pragmatic remedy” for the purported constitutional infirmity.
 
                                                            -21-
 
CSLI for an excessive period when investigating a completed crime (e.g., a murder), such as Commonwealth v. Wilkerson, 486 Mass. 159 (2020), is not persuasive.
            At bottom, the use of pole camera surveillance to surveil the exterior of two locations associated with an active, ongoing, sophisticated DTO was far from a “general search” disfavored by our appellate courts. See Keown, 478 Mass. at 239 (“Article 14 requires warrants to be ‘accompanied with a special designation of the persons or objects of search, arrest, or seizure.’ This particularity requirement ‘both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches, which was the vice of the pre-Revolution writs of assistance.’”) (citations omitted).
CONCLUSION
            For the above reasons, the Ames St. Motion and the Stearns Ave. Motion are DENIED.
ORDER
            For the above reasons, it is HEREBY ORDERED that:
            1. Defendant’s Supplemental Motion To Suppress Evidence In Light Of The
Court’s Decision In Mora (Paper No. 20) is DENIED.
            2. Defendant’s Motion To Suppress Pole Camera Evidence Used To Obtain The
Search Warrant For 81 Stearns Street (Paper No. 23) is DENIED.
 
@/s/Jeffrey T. Karp Associate Justice, Superior Court
 
@February 24, 2021
 
                                                            -22-
 
xxz